CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ANNE C. HSIEH (CABN 288159)
AMANI S. FLOYD (CABN 301506)
Assistant United States Attorneys

60 South Market Street, Suite 1200
San Jose, California 95113
Telephone: (408) 535-5596
FAX: (408) 535-5066
Anne.Hsieh@usdoj.gov
Amani.Floyd@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>GEOFFREY CHAD GIGLIO,<br><br>Defendant. | Case No. 3:25-CR-00264-VC<br><br>**UNITED STATES' MOTION TO EXCLUDE OR LIMIT TESTIMONY OF DEFENSE EXPERT**<br><br>Hearing Date: November 17, 2026<br>Hearing Time: 10:00 a.m.<br>Courtroom: 3, 17th Floor<br><br>Hon. Vince Chhabria |

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 1

II. BACKGROUND ....................................................................................................... 1

III. LEGAL STANDARDS ....................................................................................................... 3

IV. ARGUMENT ....................................................................................................... 5

A. The Defense Fails to Show that the Proffered Expert Testimony is Relevant .................... 5

B. The Defense Fails to Show that the Proffered Expert Testimony is Sufficiently Reliable Under Rule 702 ....................................................................................................... 7

C. The Proffered Testimony Should Be Excluded Under Rule 403 ....................................... 9

V. CONCLUSION ....................................................................................................... 10

## I. INTRODUCTION

Defendant Geoffrey Chad Giglio ("Giglio") is scheduled to proceed to a jury trial on December 1, 2026, on the four counts charged against him in the above-captioned case involving the following offenses: Influencing a Federal Official by Threat in violation of 18 U.S.C. § 115 (Counts One and Four), Communicating a Threat in violation of 18 U.S.C. § 875 (Count Two), and Anonymous Telecommunications Harassment in violation of 47 U.S.C. § 223(a)(1)(C) (Count Three). The charges stem from two phone calls that Giglio made, one in March 2025 and the other in June 2025, to the Castro Valley, California office of now-former United States Representative Eric Swalwell ("Congressman Swalwell") that included harassing and threatening messages towards Congressman Swalwell and his staff.

For trial, the defense has provided notice of its intent to introduce the expert testimony of Dr. Jennifer Golbeck, a purported expert in "online harassment, violent communications, and conspiracy theories on social media." Because the proffered expert testimony is irrelevant to this case, not sufficiently reliable, and outweighed by the danger of unfair prejudice, it should be excluded—or, at the very least, limited narrowly to only the evidence that the defense can demonstrate is probative, reliable, and not unfairly prejudicial.

## II. BACKGROUND

On September 18, 2026, the defense provided its expert disclosures to the government pursuant to the Court's pretrial order, noticing the government of one expert: Dr. Jennifer Golbeck, who the defense described as "an expert in online harassment, violent communications, and conspiracy theories on social media." Gov't Ex. A (Defense Expert Notice). According to the notice, Dr. Golbeck is expected to testify to the following:

> **Frequency and Normalization of Harassment and Violent Political Rhetoric on Social Media**
>
> 9. Political discussions are common on social platforms, and such discussions can be distasteful, abusive, and aggressive. For example, in my paper "Misogynistic targeting of women in power predicts broader online harassment patterns", I identified and analyzed thousands of posts that used misogynistic slurs directed at Kamala Harris, Nancy Pelosi, Lauren Boebert and Marjorie Taylor-Greene.
>
> 10. Social media content often goes beyond harassment with slurs.

It is not uncommon to find posts that discuss, encourage, and celebrate the death of government officials. For example, searching for “take out” or “hang” with government officials’ names reveals dozens of posts. Appendix A includes a small sample of such content.

11. In work conducted in my lab, for example, we analyzed 30,000 posts and categorized posts that were violent. Appendix B shows examples of some of the posts we identified that contained politically oriented discussions of violence.

12. This dataset includes threats from Donald Trump's supporters after the 2020 U.S. Presidential election. Examples include: "They can't stop what's coming!!! There's more of us than them. When absolutely necessary, take out the police as well!" and "I think at this point we need a WAR !!!!!! THEY ARE FUCKING UP EVERYTHING , We Need To KILL ALL THE EVIL 😠 😠 Which Is all the democraps 💯 💯 ☠️ 🌡 🌡 We need WAR[.]”

13. This type of incendiary language is common in far-right corners of social media. For example, President Trump himself often uses the language of “treason” to refer to his enemies (see Appendix C for examples). On the far right, references to “Treason” are used to imply “execution” because that is a possible penalty for those convicted of treason.

14. As another example, I conducted an analysis of right-wing discourse after the assassination of Charlie Kirk in 2025 for Reuters. The forums were flooded with rage and calls for vengeance, including comments like “The entire Democrat party needs to fucking hang now!”, “It’s time to end democracy.”, and “This is the Reichstag Fire,” (a reference to the 1933 arson attack that launched the Nazi party into power in Germany).

15. Narratives invoking civil war are also common on these platforms. These are generally used as rhetoric to express anger rather than as planning for activity (the January 6, 2021 attack on the Capitol being the main exception). Common posts include language like “TIME FOR SOME FUCKING CIVIL WAR FUCKING LOCK AND LOAD GENTLEMEN” and “If they try to kill ICE by defunding, MY MILITIA IS GONNA VOLUNTEER!!! Ooooooorah!!!”

16. Research shows that frequent exposure to this kind of language normalizes it, desensitizes people to it, and makes people more likely to engage in it because it is seen as socially acceptable.

**<u>Prevalence and Psychology of Conspiracy Theories on Social Media</u>**

17. Conspiracy theories are also very common in far-right media. This includes social media platforms, discussion forums, and major right wing media personalities and shows, like Alex Jones and INFOWars.

18. Psychological research shows that there are two major theories that predict people’s likelihood to believe in conspiracy theories: distrust in traditional sources of truth (experts, academics, government institutions) and poor misinformation processing skills.

19. Distrust in sources of truth, known as “epistemic mistrust” in the

> academic literature, arises from factors like having past trust violated, feelings of uncertainty or threat in the country, racism and xenophobia, and suspiciousness and paranoia.
>
> 20. Poor misinformation processing skills include things like poor analytical thinking and science illiteracy, but also a need for certainty and intolerance for ambiguity, a need to be unique / different from others, and confirmation bias.
>
> 21. Need for uniqueness is an important factor. This trait describes the desire to be smarter or more informed than others by discovering and holding unique knowledge. Because experts in an area often have unique knowledge, someone who does not have expertise but who wants to feel "special" may engage with conspiracy theories because the alternative viewpoint allows them to feel like they have risen above those experts in their knowledge.

Gov't Ex. A. The notice includes three appendices: (i) "Appendix A," titled "Example posts celebrating or encouraging the death of various government officials," (ii) "Appendix B," titled "Examples of posts with violent language from 'Cross-Platform Violence Detection on Social Media: A Dataset and Analysis," and (iii) "Appendix C," titled "Truth Social Posts from President Trump about Treason." *Id.*

## III. <u>LEGAL STANDARDS</u>

Under Federal Rule of Evidence 702, a witness may testify as an expert if she is "qualified as an expert by knowledge, skill, experience, training, or education," and "the proponent demonstrates to the court that it is more likely than not that:"

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court must play a "gatekeeping" role with respect to enforcing Rule 702, admitting any proffered expert testimony only after ensuring it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *see also* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege

exists, or evidence is admissible."). "Trial courts must exercise reasonable discretion in evaluating and in determining how to evaluate the relevance and reliability of expert opinion testimony." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

"Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation omitted); *see also* Fed. R. Evid. 401 (evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence;" and "the fact is of consequence in determining the action."). Put another way, the relevance of an expert's testimony depends on whether and to what extent her "scientific, technical, or other specialized knowledge . . . will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592.

Expert testimony is "is reliable if the knowledge underlying it 'has a reliable basis in the knowledge and experience of [the relevant] discipline.'" *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006); *accord United States v. Vera*, 770 F.3d 1232, 1235 (9th Cir. 2014). In determining whether expert testimony meets "a certain standard of reliability before it is admitted," a trial court can consider a non-exhaustive range of factors, including "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*").

The "trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable based on the particular circumstances of the particular case." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014). However, "for a scientific technique to be reliable, there must be evidence in the record indicating the methodology 'can be or has been tested.'" *Id.* at 1046 (citing *Cooper v. Brown*, 510 F.3d 870, 880–81 (9th Cir. 2007)). "The question is whether an expert's methodology 'can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'" *Id.* "Testability 'assures the opponent of proffered evidence the possibility of meaningful cross-examination (should he or someone

else undertake the testing).'" *Id*. (citation omitted).

Finally, "a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules." *Daubert*, 509 U.S. at 595. In that respect, expert testimony deemed relevant and reliable under Rule 702 may still be excluded under Rule 403 if "its probative value is substantially outweighed by the danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. A judge's duty "in weighing possible prejudice against probative force under Rule 403" is particularly important in the context of expert testimony given that such" evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (citation omitted).

## IV. <u>ARGUMENT</u>

Dr. Golbeck's proffered expert testimony should be excluded because the defense fails to show that it is (1) relevant to a fact of consequence in this case, (2) sufficiently reliable under Rule 702, and (3) that its probative value outweighs its danger of unfair prejudice under Rule 403.

### A. The Defense Fails to Show that the Proffered Expert Testimony is Relevant

The defense fails to show that Dr. Golbeck's expertise and opinions regarding social media activity are relevant to a fact of consequence in this case, which involves charged telephonic threats.

Based on its notice and proffered testimony, there is no showing that Dr. Golbeck's expertise in social media communications and behavior is relevant to a case about threatening and harassing telephone calls and voicemails. As described in the defense notice, Dr. Golbeck is an expert in "*online* harassment, violent communications, and conspiracy theories on *social media*." Gov't Ex. A (emphasis added). Indeed, her listed qualifications include: focused research on "aspects of social media and the web;" degrees in computer science, economics, and psychology; the teaching of "classes on the web and social media" and "a graduate seminar on Conspiracy Theories;" speaking at conferences "on various topics related to social media, artificial intelligence, and democracy;" publications including a book entitled "Online Harassment" that focuses on "harassing content on social media" and articles "on the radicalization process of online systems." *Id*.

Assuming Dr. Golbeck is qualified to discuss communications on social media, this is simply not

a case that involves social media—either with respect to the charged conduct or the evidence of the charged conduct. Instead, the charged threats made by Giglio occurred in two privately-communicated telephone calls directed at specific known targets, and not on any social media or other public or semi-public forums. Furthermore, the vast majority of the government's evidence surrounds the two specific telephone calls that underlie the charges, as well as other similar threatening calls made by Giglio, rather than any social media communications that Giglio may have made. In that respect, the defense has provided no explanation of how Dr. Golbeck's testimony on social media activity bears a "valid connection to the pertinent inquiry" at trial—which is, the question of Giglio's guilt in communicating the charged telephonic threats—or any other fact of consequence. *Primiano*, 598 F.3d at 565.

Importantly, the defense's notice regarding Dr. Golbeck's expert qualifications, knowledge, and testimony make no mention of any research, classes taught, conferences attended, speaking engagements, or publications relating to *telephone* communications—let alone directed, privately-communicated threats—which is what is at issue in this case. Indeed, of the 36 communications listed in the three appendixes attached to Dr. Golbeck's opinion, none are telephone communications and only one mentions a telephone call—i.e., President Trump's call with Ukrainian President Volodymyr Zelensky—which is a completely different type of telephone call from those at issue in this case. Moreover, throughout Dr. Golbeck's 53-page CV, the phrase "social media" appears 48 times, Twitter appears 51 times, and Facebook appears 46 times. In contrast, the word "phone" appears only three times, and in each instance, relates to publications that are unrelated to making a threatening or harassing telephone call. *See* Gov't Ex. B (Golbeck CV) at 43, 45 (listing media appearances and interviews: WTOP: It may sound like a family member on the phone but it could be a scammer; SyFy: The Stranger Quibi Source: Quibi Quibi's The Stranger: How creator Veena Sud made a tech horror series for your phone; and Huffington Post: Why Dogs Just Can't Seem To Recognize Us On Our Phones And Tablets).

Further, the defense also fails to show how Dr. Golbeck's specific proffered opinions bear on any fact of consequence in this case. Again, the charged conduct in this case involves telephone calls and voicemails, not social media posts or communications, and the government does not intend to introduce any social media posts made by Giglio to prove its case. Given this information, it is unclear how

Dr. Golbeck's proffered opinions and data on the "frequency and normalization of harassment and violent political rhetoric on social media" is relevant to the charged offenses, which involve telephonic threats narrowly directed at a singular targets, rather than violent language made on a public forum (or at least to a much broader audience) on social media.

The nature and context of the charged conduct here is vastly different from the subject of Dr. Golbeck's opinions. Her opinion and anticipated testimony that violent rhetoric is common and normalized online does not bear on any of the elements of the offenses here. She specifically opines that "[p]olitical discussions are common *on social platforms*, and such discussions can be distasteful, abusive, and aggressive;" "*[s]ocial media content* often goes beyond harassment with slurs;" "[i]t is not uncommon to find *posts* that discuss, encourage, and celebrate the death of government officials;" "[t]his type of incendiary language is common in far-right corners of *social media*;" and "[n]arratives invoking civil war are also common on these *platforms*." Gov't Ex. A (emphasis added). None of these opinions relate to the charged conduct in this case or any of the elements of the charged crimes. Therefore, it is entirely unclear whether or how Dr. Golbeck's proffered testimony will help the jury understand the evidence or determine a fact in issue as required under Rule 702.

In sum, given the lack of showing that Dr. Golbeck's expertise in "online harassment, violent communications, and conspiracy theories on social media" or her proffered opinions "will assist the trier of fact understand or determine a fact in issue" in this case about threatening and harassing telephone calls and voicemails, her testimony should be excluded on relevance grounds. *Daubert*, 509 U.S. at 592.

**B. The Defense Fails to Show that the Proffered Expert Testimony is Sufficiently Reliable Under Rule 702**

Although the test for reliability is flexible and the Court has discretion as to what factors it considers "based on the particular circumstances of the particular case," *City of Pomona*, 750 F.3d at 1044, the defense fails in several respects to adequately demonstrate the reliability of Dr. Golbeck's proffered testimony to warrant its admission at trial.

First, the defense provides virtually no information on the methodology underlying Dr. Golbeck's expert opinions, let alone "evidence . . . indicating the methodology 'can be or has been tested.'" *Id.* at

1046 (citing *Cooper v. Brown*, 510 F.3d 870, 880–81 (9th Cir. 2007)). In that respect, the defense fails to show that its "expert's methodology 'can be challenged in some objective sense," or is sufficiently "testable" to allow the "possibility of meaningful cross-examination." *Id*. For example, Dr. Golbeck's opinion that violent rhetoric and conspiracy theories are "very common" in far-right media appears to be based on her review of "thousands" of social media posts. However, there is otherwise little to no explanation as to what "reliable principles and methods" produced this opinion, or what "very common" means or how it is measured in her field of specialized knowledge (outside of the lay understanding of the phrase). She also appears to render several opinions on the psychology behind behavior observed online, but cites very few sources to back up those opinions (*see*, *e.g.*, Gov't Ex. A ¶ 21). Her publications appear largely to be articles in popular news media articles rather than in academic, scientific, or other peer-reviewed journals. Without the ability to be tested or "challenged in some objective sense, Dr. Golbeck's proffered testimony appears largely to constitute "simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'" *Id*.

Second, there is no showing as to the reliability of Dr. Golbeck's opinions *as applied to the facts of this case*. *See* Fed. R. Evid. 702(d) (requiring that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case"). Indeed, Dr. Golbeck's proffered testimony in the defense notice is completely devoid of any opinions specific to Giglio or the facts of this case, let alone any opinions demonstrating a reliable application of the relevant principles and methods on which she relies to this particular case. Assuming Dr. Golbeck is qualified to testify regarding social media communications based on her use of reliable methods in reviewing and analyzing extensive social media records, this in itself does not necessarily make her qualified to opine on Giglio's individual telephone calls or show how the methods she employs for her social media analysis extend to singular telephonic threats. Given the lack of information on how Dr. Golbeck applied her methodology and principles to this case, neither the government, nor the jury, will be able to test or assess the reliability of her testimony and its application to the facts and issues at trial. Thus, this Court can and should exclude Dr. Golbeck's testimony on reliability grounds.

### C. The Proffered Testimony Should Be Excluded Under Rule 403

Even if Dr. Golbeck's testimony may bear some relevance to one or more issues at trial, it should be excluded under Rule 403 because its probative value is outweighed by its danger of unfair prejudice. Dr. Golbeck's testimony is potentially prejudicial in several ways. First, it presents a substantial risk of confusing the issues, misleading the jury, and wasting time by introducing largely-irrelevant information regarding the prevalence of conspiracy theories and violent rhetoric by far-right or extremist communities on social media. The social media views and communications on which Dr. Golbeck is anticipated to testify may in themselves be polarizing, unpopular, or offensive to the jury, and thereby risk inflaming the jury for no valid purpose. It is not clear whether, how, and to what extent the defense intends to associate Giglio with these far-right social media communities that are the subject of Dr. Golbeck's testimony, let alone show how Giglio's membership or participation in these social communities bear on the elements of the charged offenses. However, to the extent that the defense intends to use Dr. Golbeck's testimony to argue that the normalization and frequency of violent rhetoric on social media excuses or mitigates Giglio's culpability for the charged threats he made in his phone calls, this will only serve to confuse the jury on the applicable law. Giglio's guilt on the charged offenses rests on specific legal elements, on which the jury will be instructed. None of the elements of the charged crimes depend on, or even implicate, whether violent rhetoric is normalized or increasingly frequent on social media—an entirely different forum than the telephonic medium by which Giglio made the charged threats in his case. Even assuming Giglio regularly operated in far-right social media communities where violent rhetoric was normalized and frequent, this fact has little to no bearing on the question of whether he intended, knew, or consciously disregarded the substantial risk that his telephonic communications would be received as threatening by the recipients of his calls.

Because Dr. Golbeck's testimony invites a significant risk of unfair prejudice that substantially outweighs any probative value, it should be excluded. In the alternative, the Court should limit admission of Dr. Golbeck's opinions only to those for which the defense makes a viable showing as to the relevance and reliability of certain testimony by Dr. Golbeck, and that the probative value of such testimony outweighs its danger of unfair prejudice.

## V. CONCLUSION

For the reasons stated above, the Court should exclude the testimony of Dr. Golbeck, or at the very least, limit it to what the defense can show is probative, reliable, and not unfairly prejudicial.

DATED: October 9, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
ANNE C. HSIEH
AMANI S. FLOYD
Assistant United States Attorneys